**NATCHEZ STEEL AND PIPE, INC., Complainant,**

v.

**VALLEY STEEL PRODUCTS CO., Defendant.**

Civ. A. No. W75–73(R).

United States District Court, S. D. Mississippi, W. D.

Feb. 11, 1977.

Jack E. Pool, Joseph S. Zuccaro, Zuccaro, Riley, Pintard & Brown, Natchez, Miss., for plaintiff.

Lucien C. Gwin, Jr., Gwin & Gwin, Natchez, Miss., for defendant.

OPINION

DAN M. RUSSELL, Jr., Chief Judge.

Natchez Steel and Pipe, Inc., a Mississippi corporation domiciled in Adams County, Mississippi, initially brought this action in the Circuit Court of Adams County, Mississippi, against Valley Steel Products Company, a Missouri corporation.[1] The parties have stipulated that the Court has diversity of citizenship jurisdiction. Although defendant, herein called Valley Steel, has not qualified to do business in Mississippi, it has been served with process pursuant to Mississippi's "long arm" statute, and has otherwise subjected itself to the jurisdiction of the Court.

Plaintiff, herein called Natchez Steel, claimed that, on or about April 25, 1975, it entered into a contract with Valley Steel whereby Valley Steel agreed to sell and deliver the plaintiff 20,000 feet of 4½″ O.D. 11.6 pound, grade J–55 seamless, long thread and coupling, 8 round thread, range 3 oil well casing, evidenced by a Telex communication of that date, and whereby plaintiff was to pay defendant the sum of $3.85 per foot, for a total of $77,000.00, providing that the casing met the agreed upon specifications. Plaintiff also alleged that defendant agreed to furnish plaintiff with independent laboratory test reports verifying that the casing conformed to recognized standards for grade J–55 casing. By successive shipments during May 1975, defendant shipped to plaintiff approximately 20,-000 feet of casing. Plaintiff alleged that the casing so delivered failed to conform to the specifications in that it failed to meet J–55 grade specification; did not meet the wall thickness standard of 4½″ O.D., 11.6 pound per foot casing; its code labeling was altered and did not conform to such labeling as required by law; it included bent and distorted joints; and a substantial portion had serious construction defects, including thin areas, cracks and gouges. Plaintiff alleged that the casing was not suitable for

1. Although defendant was initially designated as Valley Industries, Inc., doing business as Valley Steel Products Company, the parties, by stipulation, have agreed that the proper designation of defendant is Valley Steel Products Company.

the purpose for which it was intended, was not merchantable, and would not pass without objection in the trade. Although plaintiff, relying upon the representations of the defendant, admitted that it conditionally accepted the first load of casing and tendered it for sale to plaintiff's customer, one G. E. Pool, upon substantially the same specifications in plaintiff's contract with defendant, plaintiff averred that its customer refused the casing. Plaintiff averred further that despite its demands that defendant supply the test reports verifying that the casing was in fact J–55 grade, defendant failed and refused to deliver same with the exception of two reports, neither of which was identifiable with the casing delivered to plaintiff, and one of which was concealed by the defendant to plaintiff's detriment and which in fact describes material other than J–55 casing. Plaintiff alleged that due to the failure of the casing to meet the required specifications, plaintiff was called upon to defend itself, after defendant refused to assume plaintiff's defense, against the suit of its customer which suit successfully resulted in the rescission of Pool's contract with plaintiff, the rescission of a letter of credit issued by a local bank in favor of plaintiff, and the return of the casing to plaintiff. Finally, plaintiff alleged that upon its discovery of the defects and variations in the casing from the specifications agreed upon by the defendant, plaintiff orally and in writing revoked its acceptance of the casing which defendant has refused to recognize. By reason of its suit, plaintiff seeks rescission of the contract and claims by reason of defendant's breach of the contract and its warranties, plaintiff is entitled to direct and consequential damages in the full sum of $47,460.36 and punitive damages. Direct and consequential damages include a partial payment which plaintiff made, the profit plaintiff lost on its proposed sale to its customer, storage and trucking costs, costs of inspection and testing of the casing, and the costs of its aforesaid litigation with its customer, including the attorney fees incurred by plaintiff. The claim for punitive damages is based on defendant's purported falsification of code labeling on the casing, the alteration of such labeling, representations that defendant would supply independent laboratory test results knowing that same did not exist, the concealment of test results showing the casing to be other than that specified by plaintiff, and false representations as to the nature of the casing.

The defendant answered and counterclaimed for the balance of the purchase price alleged to be due in the sum of $64,-431.01. In its answer the defendant claimed that in the final contract between it and plaintiff, evidenced by defendant's letter of April 28, 1975, defendant delivered a sample load of casing consisting of 3191.2 feet of 4½″ O.D. × 11.60 #L.T.&C. Non-API Range 3 tested in accordance with the agreement of the parties. Upon receiving this shipment, dated May 6, 1975, plaintiff advised defendant that it was acceptable and to ship the remainder. Thereafter, on May 9, 10, 16 and 27, 1975, defendant shipped casing which allegedly complied with the terms of the agreement except for a final shipment containing pipe which was Range 2, but which plaintiff consented to accept in lieu of Range 3, the total pipe delivered to plaintiff aggregating 516 joints or 19,972.4 feet, all of which was in substantial compliance with the terms of the contract. Defendant admitted knowing that plaintiff intended to resell the pipe to its customer and assumed that the casing was sold for the purpose of using it as oil well casing. Defendant admitted that it had been informed of the litigation between plaintiff and its customer and the results thereof. Defendant contended that Pool, plaintiff's customer, alleged and proved that he contracted to buy from plaintiff casing bearing an API J–55 monogram, whereas, such requirement was not contained in the contract between plaintiff and defendant. The defendant denied that it owed plaintiff the obligation to defend Pool's suit against plaintiff. Defendant admitted that plaintiff had attempted unilaterally to rescind the contract between it and defendant, but denied that it had agreed to a rescission or was called upon to rectify any alleged non-conformities. For

affirmative defenses, the defendant claimed that if plaintiff had a right of rescission, which was denied, plaintiff, by its and its customer's acceptance of the sample shipment, waived any right of rescission and is estopped to claim same; exemplary damages are not recoverable in a breach of contract action in the absence of proof of tortious conduct on the part of the defendant, of which there is none; and the direct and consequential damages claimed by plaintiff do not flow from a breach of contract action. In its counterclaim, defendant admitted a partial payment by plaintiff in the sum of $12,276.12, but claimed a balance due, with credits for returned material, in the sum of $64,431.01. Defendant also claimed interest and a reasonable attorney's fee.

The case was tried to the Court without a jury, and post-trial proposed findings of fact and conclusions of law have been submitted by both parties.

According to stipulations entered into evidence, the parties agreed that, prior to the delivery of any casing to plaintiff, all communications between the plaintiff and defendant had been conducted by telephone, telex, or regular mail between representatives of the plaintiff at Natchez, Mississippi, and representatives of the defendant at its offices in either St. Louis, Missouri, or Dallas, Texas. Defendant's material originated from its yards at either Centralia, Illinois, or Dallas, Texas and was delivered by defendant's trucks to plaintiff's yard at Natchez, any material returned being returned to defendant's yard at Centralia.

John Kenneth Kossum, a salesman for Natchez Steel testified that his company deals in structural steel pipe and flat roll steel products. Neither he nor his company had ever undertaken to furnish oil well casing to a customer prior to Mr. Pool. Nevertheless, in January 1975, Kossum undertook to locate casing pipe described by Pool in a written memorandum as "11.60 lb. 4½" outside diameter J–55 or K–55 Grade 8 Round thread—long thread and coupling",

with a preference for seamless pipe. In February 1975, Kossum located a source in Texas for Mexican pipe, ERW[2] rather than seamless, to be delivered to Natchez at $4.26 per foot with a 15% mark-up price quoted to Pool. On or about March 5, 1975, Natchez Steel received a copy of an irrevocable commercial letter of credit in the sum of $100,280.00, drawn on Pool's account in a local bank, advising Natchez Steel that its drafts against this account must be accompanied by the following documents: "Commercial Invoice in triplicate evidencing shipment of 20,000 feet 4½" O.D. 8 Round Thread 11.6 lb. per foot grade J–55. Long thread and couplings, ERW." Drafts were to be negotiated no later than August 15, 1975. In a telephone call by Kossum to Valley Steel, at which time he talked to its salesman, Dennis Duchek, at the St. Louis office, Kossum learned he might get 20,000 feet of 4½" O.D. 11.60 pound 8 round thread L.T.&C. ERW J–55 casing cheaper from Valley Steel, except that Duchek indicated the Valley Steel pipe was limited service and would not carry an API monogram.[3] Kossum later carried on a three-way telephone call with Duchek and Bill Badgett, Valley Steel's products manager in Dallas, discussing with them if Valley Steel could fill the order. Upon the assurance of Badgett that Valley Steel could fill the order, Kossum, on April 25, 1975, sent the following order by Telex:

"P.O. 586

20,000 ft. 4–½ OD 11.60 lbs/ft. Grade J–55 Seamless LT and C Range 3 8 round threads. To be furnished

1. Independent test lab results showing material to meet or exceed Grade J–55

2. Hydrotest and drift to meet or exceed min. mill requirements for Grade J–55

3. Hydrotest and drift stenciled on casing

Approximately 3500 ft. of material to be shipped immediately for our inspect and approval

---

2. Electric Resistance Weld as distinct from seamless pipe.

3. API are the initials for American Petroleum Institute.

Price FOB Natchez
Terms 20/____–10 days
Price 3.85 per ft."

On the same day, Valley Steel, by Duchek, wired Natchez Steel that its order No. 586 was accepted and confirmed.

On April 28, 1975, Badgett, on behalf of Valley Steel wrote Kossum as follows:

"Confirming our recent telephone conversation concerning your P.O. #585.[4] I submit the following:

Valley Steel is not an API Treading Mill. We buy our material from the major domestic seamless mills, plain end, without a monogram. Therefore, our oil field casing does not bear the API monogram. The material supplied to you will be: 20,000' – 4–½" OD × 11.60 #L.T.&C. Non-API Range 3 – 8 RD — Material to meet or exceed J–55 specs–Tested 5000 PSI Drifted 3.875".

The above specs to be confirmed by a complete chemical and physical analysis ran by Pittsburg Testing Laboratory, with results to be forwarded to you as soon as we receive them."

At the time of his conversations with Duchek and Badgett, Kossum testified that he did not know what Grade J–55 meant or the significance of the API monogram. He later learned that J–55 is one of several grades of casing prescribed by the American Petroleum Institute. Nevertheless, he admitted he understood that the casing from Valley Steel would not bear the API stencil of Grade J–55, inasmuch as Valley Steel was not an API threading mill, and would perform its own pressure and drift tests.

Two laboratory reports from Pittsburgh Testing Laboratory are in evidence. One, dated March 31, 1975, reflects the results of physical tests and chemical analysis of one sample of 4½" O.D. seamless pipe taken from the Dallas yard, showing a thickness of .254 inches, with a tensile strength of 119,600 PSI. The chemical analysis showed .018% phosphorous and .023% sulfur. The second report, dated May 7, 1975, re-flects the results of a physical test only of one sample of 4½ inch diameter pipe, also taken from the Dallas yard, showing a thickness of .251 inches with a tensile strength of 107,665 PSI. Kossum admitted getting one of these reports timely, but said he did not see the other until after demand for it was made of Valley Steel by Natchez Steel's attorney in preparation of the suit filed by Pool against Natchez Steel and the bank which had issued the letter of credit.

On April 24, 1975, Natchez Steel issued its first purchase order, P.O. No. 586, the language therein being an exact duplication of the Telex order of April 25. A shipment of 79 joints, or 3191.2 feet of the casing, priced at $3.85 per foot, was shipped to Natchez Steel's yard under Valley Steel's Invoice No. 3929. The parties stipulated that plaintiff paid this invoice by check No. 3442, dated May 8, 1975, in the amount of $12,113.90, $12,040.40 of which liquidated the amount of the invoice insofar as it pertained to these 79 joints. Further stipulations reflect defendant's invoices for the remainder of the order, with credits given for returned joints, and the fact that plaintiff either stopped payment on checks in payment of these invoices or refused to pay, there being a present unpaid balance of $64,431.01.

As to the first shipment received by Natchez Steel, Kossum testified that after the pipe was unloaded, he and Pool visually inspected same and that Pool said it looked all right, following which Kossum notified Valley Steel to complete the order.

On May 3, 1975, Badgett, on behalf of Valley Steel, sent the following Telex to plaintiff:

"Per our telephone conversation Valley agrees to replace and pay for testing done on the 4½ OD × 11.60 pounds LT and C Non-API Casing in your yard that does not meet the following requirements

1. Each joint to full length drift to 3.875 inch

2. Each joint to hold a 5,000 pound PSI hydrotest

---

**4.** Apparently a typographical error, the Purchase Order being No. 586.

3. Any joint that does not have or exceed physical test and chemical analysis requirements of J–55. All fees for the above are to be backed up by invoices from company performing tests. Prices for tests to be reasonable and Valley is to be informed verbally of all costs as they occur.

Valley will not pay for scanologging, tuboscopping or any other similar tests.

This material will perform down hole as well as any 4½ OD by 11.60 pounds LT and C Non-API J–55 casing."

Notwithstanding these assurances from Valley Steel, Pool determined that he wanted scanologging and tuboscopping tests in addition to the test reports by Pittsburgh Testing Laboratory. Pool thereafter refused delivery of the pipe from Natchez Steel and very promptly filed a chancery court action in Adams County against Natchez Steel and the local bank to rescind his agreement with Natchez Steel and to cancel the letter of credit. The chancery court, in giving full relief to Pool, found that the casing was not as ordered by Pool and as described in the letter of credit. Natchez Steel was held to be the owner of the casing, the court finding that Pool rightfully rejected the tender of such goods, and, to the extent that any of such goods were accepted by Pool, he, Pool, timely revoked such acceptance and the contract of sale was rescinded. As noted above, the Chancellor cancelled the letter of credit, directed that it be surrendered by Natchez Steel to the bank, and dismissed the cross-claim of Natchez Steel against the bank. Both the bench opinion and the final decree of the chancery court were offered into evidence and accepted by the Court as to which the defendant made no objection to the results of the chancery suit, but did object to the Chancellor's findings.

These findings include the following numbered paragraphs:

"(1)

That the goods, i. e. casing pipe, which are the subject of this action are not fit for the purpose for which the same were designed and manufactured having cracks, gouges and pieces torn out of it, having 'mill-reject' yellow band painted thereon two or three feet from the end on much of the casing pipe which was done at the mill, that the pipe was not J–55 and some of it was seamless pipe and much of it being either N–80 or P–110 (rather than J–55), that the collars of much of said pipe was painted green in color indicating J–55 pipe, which green paint thereon was painted over red paint thereon which is the color code for N–80 pipe and that prior to the shipment of this casing from Valley Steel Products Company to Natchez Steel & Pipe, Inc., someone other than Natchez Steel & Pipe, Inc., and other than G. E. Pool, deliberately painted over the red colored collars on the casing here in question and painted green thereon, which latter color is the code for J–55 pipe, which the Court infers was done with intent not only to defraud Natchez Steel & Pipe Company, Inc., who testified they had not done any business in casing pipe of this kind, never having dealt with any oil field casing before, but it was also an attempt to mislead any person who might buy said casing pipe.

(2)

That such goods will not pass in the trade without objection under the contract description, particularly as J–55 oil well casing for which purpose said pipe was sold, that more than 50% of the pipe examined by Metallurgist Bryan were factory rejects, unsuitable as J–55 casing and were seamless rather than ERW. That much of said pipe was N–80 or P–110 oil field casing, both of which are harder, corrode quicker and are more susceptible specifically to hydrogen sulfate corrosion as well as to corrosion generally. That co-mingling J–55 casing pipe with N–80 and P–110 casing pipe causes serious trouble and problems.

(3)

That such goods are in fact not in conformity with the contract of sale between the Complainant, G. E. Pool, and the Defendant, Natchez Steel & Pipe, Inc.

(4)

That the Complainant, G. E. Pool, rightfully rejected the tender of such goods and, to the extent that any of such goods were accepted by the Complainant, G. E. Pool, proper and timely revocation of such acceptance was made and the contract of sale was rescinded."

Badgett, by way of his testimony and deposition filed of record, was 27 years old at the time this suit was tried, with five years of employment with Valley Steel, in the latter years being in charge of the production of oil country goods. He stated that Valley Steel had on hand the casing described to Kossum, all being shipped to Natchez from the Centralia yard except one load of Range 2 material that was shipped from the Dallas yard. He had several telephone conversations with Valley Steel's salesman, Duchek, and Kossum of Natchez Steel and stated to Kossum in detail exactly what the material was. When Kossum asked for test documentation, Badgett said all he could do was to cut samples from the casing he had and have Pittsburgh Testing Laboratory run the physical test and chemical analysis. He had one test report already run from a sample pipe, dated March 31, 1975 which he forwarded to Kossum and promised to send another report on another sample when it was completed. Both samples came from the Dallas yard but, according to Badgett, both were from the lot of pipe destined for Natchez Steel, whether shipped from the Centralia or Dallas yards. Badgett said that Valley Steel bought the pipe from the major domestic mills as a limited service or non-API type, and that Valley Steel threaded and collared the casing, hydrostatically testing to 80% of minimum yield and drifting it to standard specifications. He explained to Kossum that Valley Steel bought the material as plain end, rejects, yellow band, mill overruns and prime. When brought into the Valley Steel yards, Badgett said the pipe was segregated as to outer diameter and wall thickness and from there Valley Steel did its own testing and inspection. The procedure was the same in both the Centralia and Dallas yards. He admitted that Valley Steel was not an API certified threading mill or end finisher. Until testing was performed Badgett admitted there was no way to know the grade and quality of the casing, as to whether it was J–55, N–80, P–110, or rejects. In this connection he admitted the distinctive color for N–80 pipe was red paint, green for J–55, and that the casing sent to Natchez Steel had green paint applied over red at his direction. In his opinion the different grades could be mixed in a string of pipe for oil well drilling. By "limited service", Badgett said he told Kossum that each joint would pass a 5000 pound hydrostatic test and each would be drifted to show an inside diameter of 3.875 inches, but that Valley Steel did not guarantee against defects or the amount of defects in the wall thickness of the pipe; nor did Valley Steel electronically inspect the material, the hydrostatic test being considered sufficient to check for defects along with the drift. Badgett assured Kossum that each joint would be tested and drifted and that the material delivered to him would be of J–55 grade or better. He admitted that Kossum expressed a reservation about the use of the term "limited service", and they agreed to invoice the casing as "non-API".

■ The Court has carefully reviewed the testimony, and the exhibits and has no difficulty in reaching the conclusion that the casing ordered by Natchez Steel from Valley Steel was not the grade ordered by Pool, that is, API J–55, inasmuch as Valley Steel was not an API threading mill. The Court thus finds that Valley Steel owed no duty to defend Natchez Steel in Pool's suit against Natchez Steel, and, accordingly, Natchez Steel has no right to recover over against Valley Steel for its anticipated profit from its agreement with Pool, nor the costs of defense. Natchez Steel was obligated to furnish Pool with 4½" O.D. × 11.60 pound casing, Grade J–55 or K–55, 8 round thread, long thread and coupling, of electric resistance weld, or seamless, as preferred by Pool. The casing was purchased by Valley Steel in unfinished and ungraded form and Valley Steel admittedly had no

authority to affix an API stencil to such casing whatever grade it may have equalled or bettered.

■ The issue here involves the contract between Natchez Steel and Valley Steel whereby Valley Steel did not agree to furnish casing bearing the API monogram grade of J–55, but casing of that grade or better. The primary problem for resolution is whether the casing shipped to Natchez met that grade or better as specified in the contract. Kossum admitted that when Pool inspected the first shipment and said it apparently was all right, Pool reserved the right to have the casing electronically tested. This reservation on Pool's part was not passed along to Valley Steel. Kossum meanwhile did not reveal to Pool the source of the material or that he, Kossum, had agreed to accept "limited service" or non-API casing for delivery to Pool. Kossum did not want Pool to know the source in the event Pool would try to by-pass Natchez Steel for any future purchases; also Natchez Steel stood to make a greater profit on non-API casing at $3.85 per foot than that quoted on J–55 grade bearing the API stencil. Otherwise, and, because of his unfamiliarity with this type of transaction, Kossum put himself in the position of having to rely on Valley Steel's own representations as to the quality and grade of the casing.

Valley Steel's efforts to comply with its understanding of its contract with Natchez Steel may, in part, be summarized from a letter dated July 30, 1975, to Kossum signed by Badgett. This letter is quoted in full:

"This letter pertains to a load of 109 joints totalling 3532.4 feet of 4½ inch OD 11.6 lb. seamless LT&C casing shipped on May 27, 1975 from our Dallas yard to Natchez Steel & Pipe, Inc. in Natchez, Mississippi. I am in charge of the Dallas yard of Valley Steel Products Company. One load of your order of pipe was made up by our Yard Foreman, Lyndal Karrick. The following tests were run on the pipe prior to painting and stencilling:

1. The material sent to your (sic) from the Dallas yard was a part of a lot of pipe which was received in the yard shortly before your order from which a sample was cut and submitted to Pittsburgh Testing Laboratory for physical and chemical testing. A copy of the result of that test has been furnished to your attorney.

2. After your order was placed, another joint from the same lot was selected at random, and a sample cut from it was submitted to Pittsburgh Testing Laboratory for physical and chemical tests and a copy of their report on this sample has been furnished to you.

3. Each plain end tube necessary to fill your order was first examined with a snap micrometer to determine that the wall had the required .250″ thickness.

4. The pipe was all drifted by running a steel cylinder 3.875″ in diameter through the pipe to determine that there were no obstructions.

5. The pipe was threaded and collared and, with the collar on it, was subjected to a 5,000 psi, hydrostatic test in a machine in our yard.

All joints of pipe which passed the tests were painted to inhibit rust and stencilled with the dimensions, weight, and amount of the hydrostatic test and the diameter of the drift cylinder.

I certify that all of these tests were performed under my supervision and the supervision of Mr. Lyndal Karrick."

Other efforts consist of the two test reports, in evidence, from Pittsburgh Testing Laboratory, each of a sample piece of pipe chosen at random, and a third test run by this same laboratory on 7 samples, 5 two-feet lengths selected at random from the approximate 20,000 feet delivered to Natchez Steel for physical and chemical analysis and two samples from two joints containing visible defects for hydrostatic tests. The third report, based on physical and chemical analysis and hydrostatic tests in accordance with API 5A Specification for Casing, Tubing and Drill Pipe, dated March 1973, Grade J–55, 4½ O.D.—11.60 lbs. per foot, as well as the API specifications, are in evidence.

The API standards reflect that the only chemical requirement for all grades of oil field casing are a maximum of .04% phosphorous and a maximum of .06% sulfur. Physical requirements are:

"In pounds per square inch (psi) J55 and K55, minimum yield strength, 55,000 psi; maximum yield strength, 80,000 psi; tensile strength, J55, 75,000; K55, 95,000.

Tensile requirements for N–80 pipe, minimum yield strength 80,000 psi, maximum yield strength 110,000 psi, tensile strength 100,000 psi.

Hydrostatic test pressures recommended by the American Petroleum Institute for 4½″ OD 11.6 lb. pipe, long thread and coupling, are 3,000 psi standard, 4900 psi alternative."

The first two reports show that the sample cuts tested equalled or exceeded the physical specifications for J–55 pipe, and the chemical analysis reflected in one report showed that sample to be within the recommended chemical maximums.

As to the third report, it reflects that the test results for yield strength, tensile strength, elongation and flatness were all in excess of the minimum specification requirements of API J–55 pipe on the five samples with three samples exceeding the maximum yield strength of 80,000 lbs. × sq. inch specification requirements of API J–55 pipe. The chemical analysis of these five samples were under the maximum specification requirements of phosphorous and sulfur for API J–55 pipe. The hydrostatic test results of the two pipe samples with visual defects exceeded the specification requirement of API J–55. The report pointed out that all the pipe delivered to Natchez Steel was stencilled 5000 PSI Hydrostatic Test by Valley Steel. As to the two samples with visual defects hydrostatically tested, they exceeded the API J–55 requirements of 3000 lbs. per square inch and the 5000 lbs. per square inch test which Valley Steel made.

For its side of the case, plaintiff offered the deposition of E. C. McAndrews of AMF Tuboscope, Inc., which company was employed by Pool to run sonoscope tests on the casing delivered to Natchez Steel. He identified the report attached as an exhibit to his deposition which show transverse defects as revealed by sonoscoping and longitudinal defects revealed by the use of magnetic particles. The depth of the defects was measured with a pitt gauge and an ultrasonic probe to measure wall thickness. Of 20 joints, selected by Tuboscope's employees, although the report reflected that none had visible stencils as to weight, grade or manufacture, 19 had defects located variously from the coupling or pin end, and each defect was identified as to depth, length and width.

Plaintiff also relied on the expert opinion of Paul Montgomery, a consultant engineer of 28 years' experience. He reported that the collars had been painted green, but where this paint had worn off, he could see underlying red paint, a code color for grade N–80, and, in some instances, white paint, a code coloring for P–110. In his opinion none of it was of the quality of grade J–55. He found severe external corrosion and numerous deep pits in the wall of the pipe, thereby reducing the thickness of the walls, which should have been .250 inches throughout. He considered the physical condition of the casing as poor. On the assumption that casing of grades J–55, N–80 and P–110 are all used in oil or gas wells, it was his opinion that the casing he saw was not fit for that purpose. Nor did he recommend using joints of different grades in the same string. He had been told by Kossum that this pipe was for limited service, was from seamless pipe mills, and would not bear an API monogram, but was submitted to a hydrostatic test of 5000 PSI and drifted to 3.875 and was to meet the API standards for physical tests and chemical analysis. As reflected by the Pittsburgh Testing Laboratory, the tested samples exceeded the grade of J–55, revealing them to be in grades of steel that would be more brittle and therefore more conducive to corrosion in any well containing hydrogen sulfide. When asked if he would recommend the use of casing not bearing an API monogram, his response was that only

in shallow wells or when stenciled API casing was not available.

Under cross-examination Badgett outlined the manner in which Valley Steel handled pipe it bought from seamless mills. He stated that the pipe was delivered to the yard in odd sizes, where it had to be measured and sorted as to length and outside diameter, and drifted by running a cylinder through it. A snap Micrometer is used to measure wall thickness. This tool does not measure thickness the full length of a joint, but only at either end. The pipe is hydrostatically tested to 5000 PSI. Any joint which fails any of these tests is pulled out. He identified a Pettibone carry-lift which carries the joints to a threading machine where they are threaded and collars attached.

The Court in its analysis of this procedure can readily see that although the thickness of the walls at the plain or mill end of a joint may have measured .250 inches in thickness, this thickness did not remain constant throughout the length of the joint as reflected in the sonoscope and magnetic particle tests and testimony of Montgomery which showed lesser thickness in the area of defects described as cracks and gouges.

Nor is the Court impressed by the first two tests run by Pittsburgh Testing Laboratory on only two samples of pipe run on all the 4½" O.D. × 11.60 pound casing that was racked in the Valley Steel Dallas yard, when by far the majority of the casing was shipped from the Centralia yard.

The Court also finds that whatever code color appeared on the casing prior to its leaving the defendant's yards, indicating it as a reject, or as any of grades K–55, J–55, N–80 or P–110, that color was eliminated by Valley Steel and replaced by a green color, as Badgett testified, which color is a code for grade J–55. In this connection, the fact that grade N–80 or P–110 casing required higher tensile strengths does not necessarily prove that it is a better grade than J–55. The credible testimony was to the effect that the higher or greater strength reflected a harder steel, but which was more liable to corrosion, particularly when subjected to hydrogen sulfide, common to many oil and gas wells.

The Court is constrained to find that Kossum, in his effort to find J–55 casing for a customer, and although not knowledgeable in the varying structure and grades of oil well casing, exhibited that lack of knowledge in his acquiescence to buy non-API J–55 casing or better. The Court also finds that Valley Steel, in order to make its sale, took advantage of Kossum's ignorance in foisting on him and his company, casing from which samples measured 4½" O.D., were drifted to 3.875 inches, and were hydrostatically tested to more than 3000 PSI, the standard for API casing, but that nevertheless the casing, as a whole was not merchantable for the purpose for which it was sold. Plaintiff's evidence, mistakenly directed to proving that the casing was not API grade J–55, which the Court has earlier found is not what Valley Steel agreed to deliver, nonetheless convinces the Court that the casing as delivered had so many defects, resulting in varying wall thickness less than .250 inches, as to be unsuitable for the purpose for which it was purchased, and perhaps dangerous. Kossum said he had been unable to find another purchaser or use for the casing except as pipe to support sheds or to use for cattle gaps.

■ Accordingly, the Court finds that although Natchez Steel, relying on the representations of the defendant, initially accepted the first shipment, a sample shipment, it nonetheless, as soon as it learned that the casing was not acceptable to Pool, gave Valley Steel notice of its rejection. The Court finds this notice timely. See Uniform Commercial Code, Sections 75–2–602 and 608.

■ The Court further finds that Valley Steel is obligated to pay back to Natchez Steel that part of the purchase price paid by Natchez Steel, to-wit, $12,040.40, this sum having been agreed to by the parties as the correct amount, and that Valley Steel is entitled to possession of the entire shipment of casing. The Court finds that Natchez

Steel is liable for storage rents up to the time this suit was filed, and Valley Steel is liable for storage thereafter. The counterclaim of Valley Steel is denied.

An order in conformance with this opinion and assessing court costs to the defendant may be submitted within the time provided for in the local rules of this Court.